## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT CHARGING DAVID HOSSEIN SAFAVIAN

1. I, Jeffrey A. Reising, having been duly sworn, hereby depose and say:

2. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over eight years. Since April of 2005, I have assisted in a fraud and public corruption investigation.

3. This affidavit is based on the statements of DAVID HOSSEIN SAFAVIAN, witness interviews, and the review of records collected as part of the instant investigation. I have personally reviewed all of the e-mails and documents referenced in this affidavit. The information contained in this affidavit is based on my personal knowledge and experience as well as the information provided to me by other agents who have participated in the instant investigation. This affidavit does not contain all the information known to me regarding this investigation. I have included in the affidavit facts that I believe are sufficient to find probable cause for the issuance of a criminal complaint.

### THE INVESTIGATION

4. As part of this investigation, the FBI, General Services Administration Office of Inspector General ("GSA-OIG"), and Department of Interior Office of Inspector General ("DOI-OIG") have been examining allegations concerning an August 2002 Scotland golf trip that SAFAVIAN took with a Washington, D.C. lobbyist ("Lobbyist A") and SAFAVIAN's statements regarding Lobbyist A's dealings with GSA at the time that SAFAVIAN accompanied Lobbyist A on that trip.

### INDIVIDUALS AND ENTITIES

5. SAFAVIAN is a lawyer and a member of the bar in Michigan, Missouri and the District

          of Columbia.  Beginning on or about May 16, 2002, SAFAVIAN was the Chief of Staff (hereinafter "COS") for the General Services Administration (hereinafter "GSA").

6.      GSA is an agency of the United States Government.  Among other things, GSA is responsible for the development and management of property owned or leased by the Government and the disposition of property no longer used by the Government.

7.      The Naval Surface Warfare Center-White Oak ("NSWC-White Oak") was a property consisting of over 600 acres in Silver Spring, Maryland that was managed by GSA.  During the summer of 2002, GSA controlled a large portion of NSWC-White Oak.

8.      The Old Post Office ("OPO") was a building in Washington, D.C. that was managed by GSA.  The OPO, built in 1899, had once served as the City of Washington's Post Office.  During the summer of 2002, GSA controlled the building and was considering ways to develop the OPO.

9.      Lobbyist A was a Washington, D.C. lobbyist for, among others, Indian tribal clients.  In or about 1995, SAFAVAIAN worked with Lobbyist A at a Washington, D.C. law and lobbying firm.   In 2001, Lobbyist A moved to another Washington, D.C. law and lobbying firm.

10.     Entity A was a private high school established and supported by Lobbyist A.

<u>OVERVIEW</u>

11.     By May of 2002, Lobbyist A had begun to plan an August 2002 golf trip to St. Andrews in Scotland, an historic and world famous golf course.  In June and July 2002, SAFAVIAN and Lobbyist A were in contact regarding the August 2002 golf trip.  Ultimately, SAFAVIAN went on the golf trip from August 3, 2002, until his return to the

United States on August 11, 2002.

12. From in or about May 2002 until after the August 2002 golf trip, Lobbyist A conducted or sought to conduct business with GSA or sought official action from GSA. Specifically, Lobbyist A sought (A) to acquire approximately 40 acres of land controlled by GSA at the NSWC-White Oak facility for use by Entity A, and (B) changes in regulations governing the development of the OPO, including the granting of HUBZone contracting preferences that could have given some of Lobbyist A's tribal clients a competitive advantage in efforts to lease and develop the building. Before and after the August 2002 golf trip, SAFAVIAN advised and assisted Lobbyist A in his efforts to conduct the aforementioned business with GSA or seek official action from GSA.

13. By e-mail dated July 25, 2002, SAFAVIAN sought an ethics opinion from a GSA ethics officer regarding his potential acceptance of free airfare for the upcoming Scotland golf trip. SAFAVIAN falsely represented that Lobbyist A had no business before GSA and did all of his work on Capitol Hill. SAFAVIAN also omitted the fact that Lobbyist A was actively seeking assistance from GSA and that SAFAVIAN was aiding in that effort. Based on SAFAVIAN's false statements, the GSA ethics officer approved SAFAVIAN's receipt of free airfare.

14. On March 26, 2003, an anonymous tipster made a hotline complaint to GSA-OIG regarding SAFAVIAN's participation in an "international golfing trip provided by lobbyists." In March and April 2003, a GSA-OIG Regional Inspector General for Investigations questioned SAFAVIAN about the trip. SAFAVIAN falsely represented to GSA-OIG that Lobbyist A had no business with GSA prior to the August 2002 golf trip,

and SAFAVIAN omitted the fact that he was aiding Lobbyist A in Lobbyist A's attempts to do business with GSA and seek official action from GSA.

15. By letter dated February 23, 2005, the Senate Committee on Indian Affairs ("Indian Affairs Committee"), through its Chairman Senator John McCain, requested, from SAFAVIAN, records from the August 2002 Scotland golf trip. By letter dated March 17, 2005, SAFAVIAN falsely represented to the Indian Affairs Committee that Lobbyist A had no business before GSA at the time Lobbyist A asked SAFAVIAN to travel to Scotland. SAFAVIAN concealed Lobbyist A's efforts to gain GSA assistance as well as SAFAVIAN's support of these efforts.

16. On or about May 26, 2005, the affiant and a DOI-OIG Special Agent questioned SAFAVIAN about the August 2002 golf trip. SAFAVIAN falsely represented to the affiant and the DOI-OIG Special Agent that prior to the August 2002 golf trip Lobbyist A had no business with GSA, and SAFAVIAN omitted the fact that he was aiding Lobbyist A in Lobbyist A's attempts to do business with GSA and seek official action from GSA.

CHRONOLOGY OF EVENTS

17. On or about May 16, 2002, SAFAVIAN became Chief of Staff of GSA.

18. By May of 2002, Lobbyist A was seeking to find a new location for Entity A. On May 24, 2002, Lobbyist A sent an e-mail to SAFAVIAN's home e-mail address asking if GSA had property available for a school.

19. On June 14, 2002, Lobbyist A notified one of his lobbying colleagues via e-mail that SAFAVIAN was "going to join us in Scotland." The lobbyist replied: "Why dave? I like him but didn't know u [sic] did as much. Business angle?" Lobbyist A responded back

on June 15, 2002, **"Total business angle.  He is new COS of GSA."** (emphasis supplied).

20. On June 19, 2002, Lobbyist A e-mailed SAFAVIAN for information on leasing the OPO from GSA.

21. On June 30, 2002, Lobbyist A sent another e-mail to SAFAVIAN's home e-mail address. Lobbyist A wrote:

> Can you find out if you guys have control of any part of a huge federal property called the White Oak Federal Research Center, off New Hampshire Ave in Silver Spring?  I want to try to get 40 acres of that tract if possible for a non-profit.  Is it doable?

22. On July 2, 2002, SAFAVIAN responded to Lobbyist A's inquiries about acquiring 40 acres at White Oak and leasing the OPO.  SAFAVIAN reported by e-mail:

> We have not fully allocated all of the acreage at White Oak.  We are still surveying whether any other federal agencies are interested.  If not, we would begin disposal (i.e., sale or donation) proceedings.  As for the other project, you should know that aside from section 8a preferences, Indian tribes also have "hub zone" status, which provides for enterprise zone-like tax benefits.  You will need to ramp up on this as it is progressing.  Let's discuss.  Dhs.

23. From on or about July 6 through on or about July 26, 2002, Lobbyist A and SAFAVIAN corresponded via e-mail regarding the August golf trip.

24. On July 21, 2002, Lobbyist A sent the following e-mail captioned "White Oak" to SAFAVIAN's home e-mail account:

> The facility is secured, as I understand.  Any thoughts on how we could get a tour there without giving a heads up to too many folks?

25. On the same day, July 21, 2002, Lobbyist A sent an e-mail to one of his lobbying colleagues and wrote in substance and in part that SAFAVIAN was "totally supportive"

of the efforts to acquire GSA land for Entity A and that SAFAVIAN provided suggestions on how to make GSA transfer GSA property to Entity A.

26. Lobbyist A solicited SAFAVIAN's assistance and guidance regarding leasing the OPO from GSA. For example, on July 22, 2002, Lobbyist A sent an e-mail to SAFAVIAN's home e-mail address containing a draft letter purportedly to be sent by at least two members of Congress to the Administrator of GSA and requesting special consideration for HUBZone businesses. Lobbyist A asked SAFAVIAN, "Does this work, or do you want it to be longer?"

27. SAFAVIAN responded to Lobbyist A's requests for assistance and guidance regarding leasing the OPO from GSA. For example, on July 25, 2002, SAFAVIAN forwarded an e-mail describing resistance by an Office of Management and Budget ("OMB") employee to leasing the OPO from GSA. SAFAVIAN advised Lobbyist A, "I suspect we'll end up having to bring some Hill pressure to bear on OMB."

28. Likewise, Lobbyist A solicited SAFAVIAN's assistance and guidance in his efforts to acquire 40 acres of NSWC-White Oak from GSA. For example, early in the morning of July 25, 2002, Lobbyist A e-mailed SAFAVIAN's GSA e-mail address and inquired whether instead of transferring the NSWC-White Oak property, GSA could do a short-term lease explaining, "We are in a real bind on the school and I was wondering if there was a way to lease part of the White Oak site for a year."

29. Later in the morning of July 25, 2002, SAFAVIAN sought an ethics opinion from the GSA ethics officer regarding his acceptance of free airfare for the Scotland trip from Lobbyist A. SAFAVIAN told the GSA ethics officer that Lobbyist A had no dealing with

GSA. Specifically, SAFAVIAN wrote the following e-mail from his GSA e-mail address:

> I am in need of an ethics opinion. I (along with [two] members of Congress and a few Congressional staff) have been invited by a friend and former colleague on a trip to Scotland to play golf for four days. I will be paying for all my hotels, meals, and greens fees. The issue is airfare.
>
> The host of the trip is chartering a private jet to take the eight of us from BWI to Scottland [sic] and back. He is paying the cost for the aircraft regardless of whether I go or not. In fact, none of the other guest [sic] will be paying a proportional share of the aircraft costs. I need to know how to treat this activity.
>
> One other point of relevance: **the host is a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill).**

(emphasis added).

30. On July 26, 2002, the GSA ethics officer responded to SAFAVIAN's request. The ethics opinion noted that the Standards of Ethical Conduct for Employees of the Executive Branch prohibited an employee from accepting a gift from any person who was seeking official action by the employee's agency or did business, or was seeking to do business, with the employee's agency. The ethics opinion further stated in part:

> This is in response to your inquiry on whether you can accept a gift of free air transportation from a friend to attend a[] golf trip.
>
> ****
>
> You stated that neither [Lobbyist A] nor his firm does business with or is seeking to do business with GSA. Based upon the information you have provided, you may accept the gift of free transportation from your friend.
>
> ****

31. On that same day, July 26, 2002, SAFAVIAN forwarded the GSA ethics officer's e-mail

to Lobbyist A and stated: "[Lobbyist A] - fyi.  It looks like Scotland is a go."

32. As with the OPO requests, SAFAVIAN aided Lobbyist A in his pursuit of a lease for Entity A from the NSWC-White Oak property from GSA.  For example, on the same day he received the ethics opinion, July 26, 2002, SAFAVIAN forwarded an internal GSA e-mail to Lobbyist A discussing alternatives for transferring NSWC-White Oak to "high school and sports academy." SAFAVIAN also wrote to Lobbyist A: "This is the type of bureaucracy I'm dealing with.  I am still running the traps on the [one] year lease."

33. SAFAVIAN also provided specific direction on how to persuade other GSA officials to accede to Lobbyist A's requests.  For example, on July 28, 2002, SAFAVIAN sent an e-mail from his home e-mail account to Lobbyist A regarding a proposed letter from Entity A's representative to GSA officials regarding the NSWC-White Oak lease:

> You will see that I added comments in a middle paragraph.  I think you need to lay out a case for this lease.  It doesn[']t have to be detailed.  But you do need to explain what, why, where, and when.  See the bracketed commentary below.
> ***
> [I would add a couple of paragraphs concerning the school's history (if there is some), its mission, its annual budget, etc.  How is this unique or different than schools currently available to students from the area.  If you are comfortable with it, I would also add a paragraph explaining what happened with Montgomery County in order to drive home the urgency of this issue.  You need the property access sooner rather than later.  Finally, I would include a short graph about your long term plans -- to acquire land in the area -- since so many students come from Montgomery County -- and build a permanent institution.  In this section, I would NOT raise the possibility of obtaining GSA land from White Oak.  That could be seen as an unofficial reason to deny your request for use of the property this year (i.e., once they get here, it wil[l] []be hard to deny them a conveyance of property later).]

34. SAFAVIAN met with GSA employees in order to advance Lobbyist A's agenda.  On July

8

30, 2002, SAFAVIAN sent an e-mail with the subject line, "[Entity A] & White Oak," to two GSA officials. SAFAVIAN wrote "Per our conversation, how do you folks look for a meeting on this issue and possibly a quick trip to White Oak on Friday morning?"

35. On July 30, 2002, Lobbyist A sent an e-mail to his wife and two Entity A representatives. Lobbyist A wrote:

> I just went to David Safavian's office. He is the Chief of staff of the GSA and my good friend. I saw a map of the White Oak property. We identified some potential sites. They want to meet downtown on Friday at 11:30 am at the GSA building (1800 F Street, NW, room 6137). David does not think that I should be there, given my high profile politically. I agree. the three of you can go, though.

36. Later that same day, on July 30, 2002, Lobbyist A cautioned his wife via e-mail to avoid using their marital name during the August 2 GSA meeting. Lobbyist A stated in part:

> David does not want [Lobbyist A's Last Name] used in the meeting. when you check in at the door, however, you'll need your driver's license, and it's OK for you to be [Lobbyist A's Last Name] there, since that won't get up to the guy in the meeting (who probably does not know me, but David and I don't want to take a chance). OK?

37. On the day before SAFAVIAN left on the Scotland golf trip, August 2, 2002, he attended the meeting that he had arranged with a GSA official, two Entity A representatives, Lobbyist A's lobbying colleague and Lobbyist A's wife in the GSA Administrator's office to discuss the possibility of leasing from GSA the NSWC–White Oak property to Entity A.

38. On August 3, 2002, SAFAVIAN, Lobbyist A, and seven others boarded a chartered jet and flew to Scotland where they played golf on multiple courses, including the Old Course at St. Andrews. On August 8, SAFAVIAN, Lobbyist A, and others continued on to London. On August 11, SAFAVIAN, Lobbyist A, and others returned to the United

States aboard the chartered jet. The total cost of the trip for nine people well exceeded $100,000.

39. After the August golf trip, SAFAVIAN and Lobbyist A continued to correspond by e-mail about Entity A acquiring an interest in NSWC-White Oak from GSA and about Lobbyist A's business interests relating to GSA's leasing of the OPO from GSA.

## SAFAVIAN'S STATEMENT TO THE GSA-OIG

40. GSA-OIG is responsible for the investigation of illegal or improper activities involving GSA programs, operations and personnel. GSA-OIG has authority to investigate allegations of illegal conflicts of interest, gratuities and bribes provided to GSA officials by persons with business before GSA. GSA-OIG has authority to issue subpoenas and take sworn testimony.

41. On or about March 26, 2003, GSA-OIG received an anonymous hotline complaint regarding SAFAVIAN's participation in an "international golfing trip provided by lobbyists." Pursuant to that complaint, GSA-OIG opened an official investigation.

42. On or about March 27, 2003 and again on or about April 25, 2003, SAFAVIAN was interviewed by the GSA-OIG Regional Inspector General of Investigations in Washington, D.C., regarding the hotline complaint. SAFAVIAN stated in substance and in part that Lobbyist A had no business with GSA prior to the August 2002 trip. SAFAVIAN further stated in substance and in part that he had taken annual leave for the duration of the trip, and that he had reimbursed Lobbyist A for the cost of the trip - including airfare. SAFAVIAN produced a $3,100 check to Lobbyist A dated August 3, 2002, which is the date SAFAVIAN boarded the chartered jet to Scotland.

43. Because SAFAVIAN stated that Lobbyist A had no business relationship with GSA prior to the Scotland trip and that SAFAVIAN had paid for the cost of the trip, GSA-OIG closed the investigation into the "international golfing trip provided by lobbyists."

SAFAVIAN'S STATEMENT TO SENATE COMMITTEE ON INDIAN AFFAIRS

44. In or about March 2004, the Committee on Indian Affairs of the United States Senate began an investigation related to allegations of misconduct made by several Indian tribes against their lobbyists and other representatives. On September 29 and November 17, 2004, the Indian Affairs Committee held public hearings on these allegations. Testimony and documents revealed that Indian tribal funds were used to pay for the August 2002 Scotland trip.

45. By letter dated February 23, 2005, the Indian Affairs Committee, through its Chairman Senator John McCain, requested information from SAFAVIAN regarding his participation in the August 2002 Scotland trip with Lobbyist A, stating in part:

> As you may know, the Senate Committee on Indian Affairs ("the Committee") is investigating allegations of misconduct made by several Indian tribes against their lobbyists and other representatives. In furtherance of its investigation, the Committee requests that you provide no later than Wednesday March 23, 2005, all records reflecting, referring or relating to the 2002 Scotland golf trip that you attended with [Lobbyist A] and others. For purposes of this request, the term "records" includes, but is not limited to, all communications (including e-mails), notes, memoranda, itineraries, receipts, invoices, canceled checks, banking statements, reports, etc.

46. By letter dated March 17, 2005, SAFAVIAN responded to the Committee's request, stating in part:

> As you may know, I was invited by [Lobbyist A] to join his trip to Scotland in August, 2002. [Lobbyist A] and I have had a relationship since 1994, when I worked as a new associate at [the Washington, D.C.] law firm where

11

> he was a partner. **When the invitation was made, I was the chief of staff to the U.S. General Services Administration ("GSA"). [Lobbyist A] did not have any business before the agency at that time.** Prior to departure, I consulted the GSA Office of General Counsel to obtain guidance on the propriety of this trip. Counsel determined that I could accept the value of the trip *gratis*; it did not meet the definition of a "gift from a prohibited source" under the applicable regulations, nor was it considered a gift given because of my official position. Nevertheless, in the exercise of discretion, I gave [Lobbyist A] a check for the value of the trip prior to departure. In addition, I took leave without pay to travel.

(emphasis added).

47. In addition, SAFAVIAN included in the response to the Indian Affairs Committee the following documents: (A) the July 25, 2002 e-mail from SAFAVIAN to a GSA ethics officer (discussed in paragraph 29, *supra)*; (B) the GSA ethics opinion (discussed in paragraph 30, *supra*); (C) a facsimile cover sheet from a GSA ethics officer to SAFAVIAN dated March 1, 2005; and (D) copies of SAFAVIAN's $3,100 check payment to Lobbyist A that was dated the day SAFAVIAN left for Scotland.

## SAFAVIAN'S STATEMENT TO THE FBI

48. As part of the instant investigation, on or about May 26, 2005, your affiant and a DOI-OIG Special Agent interviewed SAFAVIAN at his Washington D.C. office in the Eisenhower Executive Office Building.

49. During this interview, SAFAVIAN stated in substance and in part that Lobbyist A had asked about acquiring land for Entity A and the OPO significantly well after the August 2002 Scotland trip and that, at the time of the trip, Lobbyist A had no business with GSA.

50. Based on my experience as an FBI Special Agent, I believe the facts described in paragraphs 1-49 constitute probable cause to believe that DAVID HOSSEIN SAFAVIAN has violated Title 18, United States Code, Sections 1001, 1505. I declare under penalty of perjury that the information provided above is true and correct.

Dated September \_\_\_, 2005.

_____
                                          Jeffrey A. Reising
                                          Special Agent
                                          Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO before me this \_\_\_ day of September 2005.

                                        _____
                                        United States Magistrate Judge
                                        District of the District of Columbia